BEFORE THE FIRST DIVISION, NOVEMBER 15, 1944

**No. 49800.**—Protests 36018–K, etc., of Advertising Corp. of America (New York).

WALKER, Judge: Certain pigskin leather was assessed for duty at the rate of 30 percent ad valorem under the provision in paragraph 1530 (d), Tariff Act of 1930, for "fancy leather." It is claimed to be properly dutiable at 12½ percent or 15 percent ad valorem under the provisions of paragraph 1530 (c) of the same act as modified by the Presidential proclamation reported in T. D. 44603 or the British Trade Agreement reported in T. D. 49753. The pertinent portions of these provisions read as follows:

PAR. 1530. * * *
(d) Leather of all kinds, grained, printed, embossed, ornamented, or decorated, in any manner or to any extent (including leather finished in gold, silver, aluminum, or like effects), or by any other process (in addition to tanning) made into fancy leather * * * all the foregoing by whatever name known, and to whatever use applied, 30 per centum ad valorem.

Paragraph 1530 (c), as enacted, read as follows:

(c) Leather (except leather provided for in subparagraph (d) of this paragraph), made from hides or skins of animals (including fish, reptiles, and birds, but not including cattle of the bovine species), in the rough, in the white, crust, or russet, partly finished, or finished, 25 per centum ad valorem * * *.

On February 5, 1931, the rate of duty on certain pigskin leather covered by the foregoing provision was reduced from 25 percent to 15 percent by Presidential proclamation issued by virtue of the provisions of section 336, Tariff Act of 1930, such reduction being limited to—

* * * pigskin leather, in the rough, in the white, crust, russet, partly finished, or finished, not imported to be used in the manufacture of boots, shoes, or footwear, or cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear * * *.

By the terms of the British Trade Agreement the duty on pigskin leather such as that described above was reduced to 12½ percent.

A sample of the merchandise is before us as exhibit 2. It appears to consist of pigskin leather on which there is a mottled effect, or, in other words, dark spots here and there on the background of a lighter finish.

The evidence offered on behalf of the plaintiff consists of the testimony of one Holden T. White, governing director of the exporter of the merchandise in issue, taken under a commission issued out of this court. After indicating his familiarity with the leather in issue, Mr. White described the finish thereon as a "brindle finish," and went on to say—

* * *. The normal method of finishing a pigskin is to give it an even coat of stain, but in the case of the brindle finish exactly the same color is applied but it is put on very uneven. In other words the finishing coat is very badly applied indeed. One might say that slovenly work is accentuated. In the finishing of these as in all our pigskins, no pigment but only aniline stain is used and the pigskins are in no way decorated or embossed.

Although the witness used the term "slovenly work" in describing the manufacture of the skins at bar, it is clear that the mottled or brindle effect was deliberately sought and was in nowise accidental.

The evidence offered on behalf of the defendant consists of the oral testimony of one Martin G. Kliemand, a sales distributor for tanners of pigskin leathers, whose experience in the leather industry was shown to have been very extensive. Mr. Kliemand stated that tanning and finishing of leather are two distinct processes, the latter starting where the former leaves off. Shown exhibit 2, he said that it did not have the same appearance as a usual piece of finished pigskin, which, he said, is of a single color, and he characterized exhibit 2 as fancy leather.

It appears to be manifest that the plaintiff has not by the evidence offered made out a *prima facie* case sufficient to overcome the presumption of correctness attaching to the collector's classification of the leather in issue as "fancy leather." However, the brief filed in plaintiff's behalf is devoted to the argument of two propositions of law, which we will now consider.

At the trial it was stipulated by counsel that exhibit 2 was "neither grained, printed nor embossed." Counsel for the plaintiff points out that the collector's classification of it as fancy leather must then rest upon its having been so made by having been—

* * * ornamented or decorated in any manner or to any extent (including * * * finished in gold, silver, aluminum, or like effects), or by any other process (in addition to tanning) made into fancy leather * * *.

It is then argued—

If "leather finished in gold, silver, aluminum or like effects" is leather ornamented or decorated in any manner or to any extent or by any process made into fancy leather, there would have been no reason for Congress to specifically command that leather so finished be included in the provision. By specifically naming color finishes in gold, silver, aluminum, or like effects, the Congress excluded color finishes other than gold, silver, aluminum of like effects. The rule of *expressio unius est exclusio alterius* which has been repeatedly cited, approved and followed by this court and the Court of Appeals compels that conclusion. *United States* v. *Penick*, 24 C. C. P. A. 436, 440; *Pustet* v. *United States*, 13 Ct. Cust. Appls. 532, *United States* v. *Smith*, 12 Ct. Cust. Appls. 384, 388; *United States* v. *Mulhens*, 4 Ct. Cust. Appls. 496, 499; *United States* v. *Harper*, 2 Ct. Cust. Appls. 101, 103.

A color effect in yellowish-brown, whether mottled or otherwise is not a finish in gold, silver, aluminum, or like effect. Under the above stated rule of *expressio unius est exclusio alterius* pigskin finished in a mottled yellowish-brown color is excluded from the high duty classification in paragraph 1530 (d) * * *.

We fail to see how the rule of interpretation cited can be applied to the language of the statute quoted. It would appear that the parenthetical expression

"(including leather finished in gold, silver, aluminum or like effects)", contains words of extension rather than words of limitation, and that it was the intention thereby to include leather finished in those effects, which might not ordinarily be covered by the terms "ornamented or decorated in any manner or to any extent." Furthermore, it would appear that the parenthetical expression does not refer to the following provision "or by any other process (in addition to tanning) made into fancy leather."

The second proposition argued in the brief refers to the fact that pigskin leather is not specifically named in either paragraph 1530 (c) or paragraph 1530 (d), but is specifically named in the schedule appended to the British Trade Agreement, and it is contended that the proclamation therefore covers all kinds of pigskin leather. A mere glance at the schedule as printed in T. D. 49753, however, is sufficient to inform that the pigskin leather covered thereby is only that embraced within paragraph 1530 (c), for that subparagraph number appears in the appropriate column denoting the tariff paragraph covered by the articles on which the rates were modified. Furthermore, the language used under the caption "Description of article" to describe the merchandise covered by the said subparagraph on which the rates were intended to be modified begins as follows:

Leather (*except leather provided for in subparagraph (d) of paragraph 1530, Tariff Act of 1930*), * * *. [Italics added.]

giving added proof that it was not intended thereby to modify the provisions of paragraph 1530 (d).

For the reasons stated the protests are overruled, and judgment will issue accordingly.